No. 23-3346

IN THE UNITED STATES COURT
OF APPEALS FOR THE SIXTH CIRCUIT

MARILYN CROSSLEY
*Plaintiff-Appellant,*

v.

KETTERING ADVENTIST HEALTHCARE D/B/A KETTERING HEALTH
NETWORK
*Defendant-Appellee*

and

BELINDA ISAAC
*Defendant-Appellee*

On Appeal from the United States District Court
for the Southern District of Ohio,
The Honorable Michael J. Newman, U.S. District Judge

**BRIEF OF DEFENDANTS-APPELLEES
KETTERING ADVENTIST HEALTHCARE D/B/A KETTERING HEALTH
NETWORK AND BELINDA ISAAC**

Timothy G. Pepper (0071076)
Christopher M. Wolcott (0099696)
TAFT STETTINIUS & HOLLISTER LLP
40 N. Main Street, Suite 1700
Dayton, Ohio 45423
Tel: 937.228.2838
Fax: 937.228.2816

pepper@taftlaw.com
cwolcott@taftlaw.com

July 20, 2023

*Attorneys for Defendants-Appellees*
*Kettering Adventist Healthcare d/b/a*
*Kettering Health Network and Belinda Isaac*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6 Cir. R. 26.1, Defendant-Appellee Kettering Adventist Healthcare d/b/a Kettering Health Network (n/k/a Kettering Health) makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

Defendant-Appellee Kettering Adventist Healthcare d/b/a Kettering Health Network (n/k/a Kettering Health) is not a subsidiary or affiliate of a publicly owned corporation.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If Yes, list the identity of such corporation and the nature of the financial interest:

There is not a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

**Page(s)**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ................................................................................................ i

TABLE OF CONTENTS ...................................................................... ii-iii

TABLE OF AUTHORITIES ................................................................ iv-vii

STATEMENT REGARDING ORAL ARGUMENT .......................................... viii

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

    A.   The Parties' Obligations under HIPAA ...................................................... 2

    B.   Crossley's Employment with Kettering.. .................................................. 4

    C.   Crossley's Termination for Repeated Instances of Misconduct ................ 7

    D.   Crossley's Requests for, and Receipt of, Reasonable Accommodations and Exemptions ...................................................................................... 16

        1. Parking in Preferred Parking Spot ..................................................... 16

        2. Exemption from Vaccine Requirement ............................................... 18

        3. Exemption from the CPR Certification Requirement. ........................ 19

    E.   Other Necessary and Nondiscriminatory Management Decisions.. ....... 20

        1. Assignment of Patients to Therapists ................................................. 20

        2. Work Schedules and Crossley's Voluntary Move to Part-Time Status ............................................................................................... 22

    F.   Procedural History.. ............................................................................ 25

SUMMARY OF THE ARGUMENT ............................................................. 27

ARGUMENT ............................................................................................ 28

A.    Standard of Review............................................................28

B.    The District Court Correctly Awarded Defendants Summary Judgment
      on All Claims.................................................................29

      1. Applicable Legal Standards...............................................30

          a. Disability Discrimination...........................................30

          b. Age Discrimination..................................................33

          c. The Honest Belief Rule..............................................35

          d. Reasonable Accommodations...........................................36

      2. Crossley's Termination was Lawful.......................................38

          a. Crossley failed to establish that the stated reasons for terminating
          her employment (*i.e.*, her repeated and egregious violations of
          Kettering's policies and HIPAA) were a mere pretext....................39

          b. Regardless of whether the Sixth Circuit's honest belief rule
          applies, Crossley loses...............................................41

      3. Crossley's Remaining Claims are Waived..................................43

CONCLUSION ...................................................................43-44

CERTIFICATE OF COMPLIANCE......................................................45

CERTIFICATE OF SERVICE .......................................................46

ADDENDUM .....................................................................47

**Cases**                                                                **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 249, 252, 106 S.Ct. 2505, 91 L.Ed.2d. 202 (1986) ...............29, 40

*Babb v. Maryville Anesthesiologists P.C.*,
   942 F.3d 308, 319-320 (6th Cir. 2019)....................................................30, 31, 38

*Blizzard v. Marion Tech. College*,
   698 F.3d 275, 286, 287 (6th Cir. 2012) .........................................................35, 42

*Brennan v. Tractor Supply Co.*,
   237 F. App'x 9, 20 (6th Cir. 2007)........................................................................36

*Burlington Indus. v. Ellerth*,
   524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ...........................32

*Cash v. Siegel-Robert, Inc.*,
   548 F. App'x 330, 334 (6th Cir. 2013)............................................................ 36-37

*Chen v. Dow Chem. Co.*,
   580 F.3d 394, 400 (6th Cir. 2009) .......................................................................35

*Clay v. United Parcel Serv., Inc.*,
   501 F.3d 695, 713-14 (6th Cir. 2007).................................................................36

*Darby v. Childvine, Inc,*,
   956 F.3d 440, 444 (6th Cir. 2020) .......................................................................30

*Doe v. Michigan State Univ.*,
   989 F.3d 418, 425 (6th Cir. 2021) .......................................................................43

*EEOC v. Ford Motor Co.*,
   782 F.3d 753, 757 (6th Cir. 2015)........................................................................37

*Ferrari v. Ford Motor Co.*,
   826 F.3d 885, 891-892 (6th Cir. 2016).................................................................31

*Gaglioti v. Levin Grp., Inc.*,
   508 F. App'x 476 (6th Cir. 2012)....................................................................40, 41

*Gray v. Toshiba Am. Consumer Prods.*,
263 F.3d 595, 600 (6th Cir. 2001) ........................................................36

*Gross v. FPL Fin. Servs., Inc.*,
557 U.S. 167, 177-78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2008) ......................33

*Hankins v.The Gap, Inc.*,
84 F.3d 797, 800 (6th Cir. 1996) ..........................................................38

*Hedrick v. W. Resrv. Care Sys.*,
355 F.3d 444, 452 (6th Cir. 2004) ........................................................37

*Inland Bulk Transfer Co. v. Cummins Engine Co.*,
332 F.3d 1007, 1014 (6th Cir. 2003) ....................................................39

*Jakubowski v. Christ Hosp., Inc.,*
627 F.3d 195, 201 (6th Cir. 2010) ........................................................30

*Keith v. Cnty of Oakland*,
703 F.3d 918, 923 (6th Cir. 2013) ........................................................37

*Kleiber v. Honda of Am. Mfg.*,
485 F.3d 862, 868 (6th Cir. 2007) ....................................................30, 37

*Levine v. DeJoy,*
64 F.4th 789, 786, 796 (6th Cir. 2023) ..............................................28, 39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp,*
475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ......................28, 29

*Mile v. South Central Human Resources Agency, Inc.*,
946 F.3d 883, 887 (6th Cir. 2020) ....................................................34, 35

*Mitchell v. Vanderbilt Univ.*,
389 F.3d 177, 182 (6th Cir. 2004) ....................................................32, 34

*Ornelas v. United States*,
517 U.S. 690, 705, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ......................39

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318, 324 (6th Cir. 2021) ..............................................33, 34, 38

*Plautz v. Potter*,
   156 F. App'x 812, 817 (6th Cir. 2005)............................................................32, 34

*Rorrer v. City of Stow*,
   743 F.3d 1025, 1046 (6th Cir. 2014) ...................................................................37

*Sjostrand v. Ohio State Univ.*,
   750 F.3d 596, 599 (6th Cir. 2014) .......................................................................32

*Smith v. Chrysler Corp.*,
   155 F.3d 799, 805, 807 (6th Cir. 1998) .........................................................31, 35

*Smith v. Honda of Am. Mfg., Inc.*,
   101 F. App'x 20, 25 (6th Cir. 2004).....................................................................38

*Spitulski v. Bd. of Educ. of the Toledo City Sch. Dist.*,
   121 N.E.3d 41, 54, 2018-Ohio-3984 (6th Dist.)..................................................30

*Talley v. Fam. Dollar Stores of Ohio, Inc.*,
   542 F.3d 1099, 1108 (6th Cir. 2008) ...................................................................37

*Wharton v. Gorman-Rupp Co.*,
   309 F. App'x 990, 995 (6th Cir. 2009)..................................................................33

*White v. Baxter Healthcare Corp.*,
   533 F.3d 381, 389-390 (6th Cir. 2008)......................................................28, 29, 39

*Wright v. Murray Guard, Inc.*,
   455 F.3d 702, 707-08 (6th Cir.) ...........................................................................36

**Statutes**

29 U.S.C. § 623...............................................................................................................25

29 U.S.C. § 623(a)(1) .....................................................................................................33

42 U.S.C. § 12010 ..........................................................................................................25

42 U.S.C. § 12101 ....................................................................................................25, 26

45 C.F.R. § 164.502(b)(1)................................................................................................4

45 C.F.R. § 164.512(d)(2)................................................................................................3

O.R.C. § 4112.02 ................................................25, 26

O.R.C. § 4112.14 ................................................26

O.R.C. § 4112.14(A) ............................................33

O.R.C. § 4112.99 ................................................26

**Rules**

Civ.R. 65(C).......................................................18

Fed.R.Civ.P. 56(a)................................................3

**Other Authorities**

Health Insurance Portability and Accountability Act of 1996, Pub. L.
No. 104-191 (1996) ("HIPAA") ............................2-6, 8, 9, 11-15, 27, 29, 39, 40

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellees Kettering Adventist Healthcare d/b/a Kettering Health Network (n/k/a Kettering Health) and Belinda Isaac join in Plaintiff-Appellant Marilyn Crossley's statement in support of oral argument.

# STATEMENT OF THE ISSUES

Are Defendant-Appellees Kettering Adventist Healthcare d/b/a Kettering Health Network (n/k/a Kettering Health) ("Kettering") and Belinda Isaac ("Isaac") (sometimes, collectively "Defendants") entitled to summary judgment on Plaintiff-Appellant Marilyn Crossley's ("Plaintiff" or "Crossley") claims that the termination of her employment constituted either disability, age discrimination, or both?

# STATEMENT OF THE CASE

## A.    The Parties' Obligations under HIPAA

One of the most important responsibilities for Kettering's management is to ensure that Kettering complies with its legal obligations to protect the personal health information ("PHI") of its patients, in accordance with the patient privacy requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Kettering's management carries out that task by establishing policies regarding HIPAA compliance and the protection of PHI, and then ensuring that employees under their direction follow those policies. (Sheldon Decl., RE 58, Page ID # 1136). Isaac, as Crossley's supervisor, was one of the managers primarily responsible for ensuring Crossley's compliance with Kettering's HIPAA policies. (Isaac Decl., RE 58, Page ID # 1128). But as with all things that Isaac did in connection with the facts of this case, Isaac undertook that responsibility in collaboration with other professionals at Kettering including, but not limited to, Kettering's experts in human resources management, privacy regulation compliance, and her supervisors and peers. (Isaac Decl., RE 58, Page ID # 1134-35).

One of Kettering's most important HIPAA policies implements one of HIPAA's most important legal requirements: the legal obligation to ensure only the "minimum necessary" access to PHI by employees. (Sheldon Dep., RE 55, Page

ID # 1072-74). "When using or disclosing protected health information . . ., a covered entity [Kettering] . . . must make reasonable efforts to limit the use of protected health information to the minimum necessary to accomplish the intended purpose of the use." 45 C.F.R. § 164.502(b)(1). In other words, it is the legal responsibility of Kettering to make reasonable efforts to limit the use of PHI to the bare minimum that is necessary for Kettering to accomplish the intended purpose of the use. *See id.*

Because Kettering must give access to some patient PHI to its therapists to allow them to accomplish the tasks assigned to them by Kettering's management, Kettering must "make reasonable efforts" to limit that access and use to the minimum extent necessary. To do that, Kettering must determine which of its employees need access to PHI to carry out their duties, determine what PHI those employees need to perform their duties and under what conditions they may use it, and then make reasonable efforts to limit their use in accordance with those determinations. *See* 45 C.F.R. § 164.512(d)(2). The plain language of the HIPAA statute gives "covered entities" the power and responsibility to determine the conditions under which an employee may use a patient's PHI. *See id.*; (Sheldon Dep., RE 55, Page ID # 1075-77). Kettering, the institutional health care provider, is the "covered entity" under federal law and no employee of a "covered entity," such as Crossley, is a "covered entity" themselves.

Kettering, like all large health care institutions, takes its responsibilities under HIPAA seriously. To that end, it has established a centralized group of employees to develop and maintain its HIPAA policies, to train employees on HIPAA compliance, and to assist in the enforcement of those policies. The leader of that group at all times relevant hereto was Megan Sheldon.[1] (Sheldon Decl., RE 58, Page ID # 1136). Sheldon was one of the primary drafters of Kettering's HIPAA policies and frequently worked with other members of Kettering's management in investigating potential HIPAA violations and determining the appropriate level of disciplinary response. (Sheldon Decl., RE 58, Page ID # 1136).

Kettering's HIPAA policies—which are always available to its employees, including Crossley—are just one part of its effort to comply with the law. As explained further below, Kettering's HIPAA policies are supplemented by mandatory HIPAA training for all Kettering employees, additional written HIPAA compliance resources, and the specific instructions of management to individual employees regarding specific issues.

## B.    Crossley's Employment with Kettering

Crossley was employed as a speech language pathologist by Kettering in its NeuroRehab and Balance Center ("NeuroRehab"). Isaac was Crossley's supervisor

---

[1] Sheldon's last name was Brickner during Crossley's employment and therefore most of the documentary evidence in this case refers to Sheldon by that name.

and the NeuroRehab manager. (Isaac Decl., RE 58, Page ID # 1128). Crossley's job was to provide speech language pathology services to the patients that were assigned to her by Kettering's management. Crossley was neither a supervisor nor an independent contractor and therefore, like any employee, Crossley was required to take direction from her managers and to conduct herself accordingly. (Isaac Decl., RE 58, Page ID # 1128).

Kettering's management occasionally directed or permitted Crossley to provide on-the-job training to other speech therapists, but only in accordance with the terms and conditions set by management. (Isaac Decl., RE 58, Page ID # 1128-29). Compliance with Kettering's HIPAA policies, outlined below, was a key factor in how Kettering managed this occasional aspect of Crossley's job; and she was only permitted to access a patient's PHI for training purposes when she was actually engaged, with the permission of management, in the on-the-job-training of another NeuroRehab employee. (Isaac Decl., RE 58, Page ID # 1128-29). At no point did Kettering or its management ever direct, expect, or permit Crossley to conduct a retrospective, after-treatment review of any patient's chart for quality control purposes when the patient was under the care of another therapist. (Isaac Decl., RE 58, Page ID # 1129). Indeed, it would be a HIPAA violation for any employee, including Crossley, to access a patient's PHI for "training purposes" if she was not actually performing authorized training at that time. (Isaac Decl., RE

58, Page ID #1129). It would similarly be a HIPAA violation for any employee, including Crossley, to access a patient's PHI for "quality control purposes" if she was not assigned that quality control task by Kettering's management. And at no point in 2019 was Crossley ever assigned a quality control task by Kettering's management. (Isaac Decl., RE 58, Page ID # 1129).

Kettering employs other people who are tasked with assigning particular patients to particular therapists for treatment and then scheduling those treatment sessions. (Crossley Dep., RE 39, Page ID # 324). Crossley did not supervise anyone at Kettering, including those assigning/scheduling employees, and at no point did Kettering's management ever direct, expect, or permit Crossly to undertake the task of assigning particular patients to particular therapists for treatment, scheduling treatment sessions, or reviewing the work of those who did perform those tasks. (Isaac Decl., RE 58, Page ID # 1129). Because the task of assigning particular patients to particular therapists typically requires the use of a patient's PHI, it would be a HIPAA violation for any employee, including Crossley, to access a patient's PHI for the purpose of reviewing the assignment of that patient to a particular therapist without the express authorization of Kettering's management to do so. Crossley never had that authorization. (Isaac Decl., RE 58, Page ID # 1129).

## C.     Crossley's Termination for Repeated Instances of Misconduct

Beginning in spring 2019, Crossley became dissatisfied with the way in which Kettering was assigning particular patients to particular therapists. She suspected that some patients who were assigned to other therapists could have been assigned to her, especially so-called "facial patients" (patients who needed rehabilitation services for disorders affecting their faces, including Bell's Palsy). In fact, Crossley believed that if particular patients *could* have been assigned to her then they *should* have been assigned to her; but she had no actual knowledge of how facial patients were assigned to therapists, nor did she have any actual knowledge of how many facial patients were being seen by other therapists. (Crossley Dep., RE 39, Page ID # 296). Therefore, to investigate her suspicions, Crossley took it upon herself to access the PHI of patients who were not assigned to her—including Bell's Palsy and other facial patients—for the purpose of evaluating for herself whether those patients could or should have been assigned to her. (Crossley Dep., RE 39, Page ID # 323-28). She did not have the permission of Kettering's management to undertake such an "investigation" nor did she have permission to access the PHI of patients that were not assigned to her. (Crossley Dep., RE 39, Page ID # 323-28).

Crossley's misconduct came to the attention of Debra McConnell who was another member of management at Kettering's NeuroRehab Center. (Crossley

Dep., RE 39, Page ID # 323, 333; Isaac Dep., RE 43, Page ID # 433-34, 439-40). Upon learning of it, McConnell instructed Crossley on multiple occasions to stop accessing patient PHI for the purposes of reviewing Kettering's assignment and scheduling decisions because it was a violation of both Kettering policy and HIPAA. (Crossley Dep., RE 39, Page ID # 324-25, 330-31). Undeterred—because she simply disagreed with McConnell—Crossley continued her pattern and practice of violating HIPAA by accessing patient PHI without authorization. (Crossley Dep., RE 39, Page ID # 434-35, 437). Indeed, Crossley readily admits that she ignored McConnell's admonitions, did not consult Kettering's HIPAA guidance resources,[2] did not consult with her supervisor, did not consult with Kettering's Human Resources department, did not consult with any other member of Kettering's management team, and did not make any other attempt to conform her conduct to align with Kettering's and HIPAA's requirements. (Crossley Dep., RE 39, Page ID # 318-19, 330-31, 333-34).

On July 29, 2019, Crossley's misconduct, as well as McConnell's futile warnings, came to the attention of Isaac. (Isaac Dep., RE 43, Page ID # 439-40, 450; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 739). Isaac did not act on the information at that time, however, instead giving Crossley an opportunity to either

_____

[2] Crossley also admitted that she knew where to find Kettering's HIPAA policies but chose not to look at them. (Crossley Dep., RE 39, Page ID # 318-19).

heed the directives of McConnell or to confirm McConnell's directives through other sources. Crossley did not take advantage of that opportunity and, on August 8, 2019, McConnell again learned that Crossley was continuing to access patient PHI for the purposes of reviewing Kettering's assignment and scheduling decisions and McConnell, again, advised Isaac of that fact. At that point, Isaac had no choice but to act and she contacted Megan Douglas, Kettering's Human Resources Leader Partner, for assistance. (Douglas Dep., RE 41, Page ID # 369; Isaac Dep., RE 43, Page ID # 440; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 739).

On August 9, 2019, Douglas contacted Sheldon, the leader of Kettering's HIPAA compliance group, and Audra Barkley, another employee who worked in the HIPAA compliance group and reported to Sheldon. Kettering's patient PHI is maintained in an electronic medical record system and reports can be run to determine and evaluate the recent activity of an employee accessing patient PHI in that system. (Douglas Dep., RE 41, Page ID # 378-79; Isaac Dep., RE 43, Page ID # 440; Slip Sheet-Exhibit BB, RE 49-22, 737-38).  Douglas asked that just such a report be run regarding Crossley, and Barkley did so for the period of July 26 through August 7, 2019. That report was then sent to Douglas and Isaac for review. (Douglas Dep., RE 41, Page ID # 370).

When Isaac reviewed the report, she looked to determine which patients were actively under Crossley's care—*i.e.*, the patients for which Crossley probably

had a legitimate business purpose in accessing their PHI—and which were not. Because Crossley was not assigned any training responsibilities at that time, and because she was *never* responsible for assigning patients to therapists or reviewing the work of any other employee, Isaac determined that Crossley probably did not have a legitimate business reason to access the PHI of any patient who was not actively under her care. (Isaac Dep., RE 43, Page ID # 441, 445-46). There were 47 such patients whose PHI and records Crossley accessed in the short time between July 26 and August 7, 2019. (Douglas Dep., RE 41, Page ID # 381; Isaac Dep., RE 43, Page ID # 441; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 737).

Isaac reported her findings to Douglas who, in the days that followed: reported the findings to Sheldon and Barkley, confirmed with Barkley that Crossley's actions constituted significant violations of Kettering's patient privacy policies, and was asked by Barkley whether Crossley would be terminated. (Douglas Dep., RE 41, Page ID # 381; Isaac Dep., RE 43, Page ID # 441-42, 451; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 736).

On August 15, 2019, Isaac and Douglas met with Crossley to ask her why she had accessed the PHI of those patients for whom she was not providing treatment. (Isaac Dep., RE 43, Page ID # 442). Crossley provided several different reasons. For some patients, Crossley explained that she was curious as to why they had been assigned to other therapists instead of to her; for others, she said she

knew them and was just curious about their health;[3] and for yet other patients, she

claimed to be accessing their PHI for training purposes—this despite the fact that

she was not involved in any training that would require her to access a patient's

PHI at that time. None of these proffered reasons were legitimate reasons to access

a patient's PHI under Kettering's policies or HIPAA, irrespective of Crossley's

insistence otherwise. (Douglas Dep., RE 41, Page ID # 378; Isaac Dep., RE 43,

Page ID # 442-45, 453; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 734; Slip

Sheet-Exhibit EE, RE 50-14, Page ID # 955-1013).

Isaac and Douglas told Crossley at the August 15, 2019 meeting that her

conduct was in violation of HIPAA. (Douglas Dep., RE 41, Page ID # 383; Isaac

Dep., RE 43, Page ID # 442-43). This was not the first time that Crossley had

received this message; as noted above, McConnell had given her similar warnings

on multiple occasions in the past. Nevertheless, in an effort to give Crossley every

possible benefit of the doubt, Douglas and Isaac worked with Barkley between

August 16 and August 18, 2019 to evaluate Crossley's speculative suggestion that

some of the inappropriate access may have been caused by a technical glitch/issue

with Kettering's electronic medical record system. After performing numerous

---

[3] *Compare* Isaac Dep., RE 43, Page ID # 446-47 (identifying a patient that
Crossley knew and about whom she was merely curious), *with* Slip Sheet, RE 49-
23, Page ID # 742-48 (identifying the same patient as one whose PHI was
unlawfully accessed by Crossley).

tests and evaluating the system as a whole, Barkley confirmed that Crossley's speculation was not accurate. (Isaac Dep., RE 43, Page ID # 442-43; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 734-36). And even if it was, it does nothing to undermine Crossley's express admission that she accessed patient PHI for impermissible reasons.

On August 19, 2019, Douglas asked Barkley to run one more report—this time for the time period of August 16, 2019 through August 19, 2019—to determine if Crossley had ignored the warnings she received on August 15, 2019. (Isaac Dep., RE 43, Page ID # 443-44; Slip Sheet-Exhibit EE, RE 49-25, Page ID # 750). Barkley did so and Isaac reviewed the second report the next day. That second report showed that, on August 19, 2019, Crossley accessed the patient records for three patients that she was not treating and also reviewed PHI for a patient who had been assigned to another therapist for an initial evaluation. (Isaac Dep., RE 43, Page ID # 446-47; Slip Sheet-Exhibit FF, RE 49-26, Page ID # 762). The latter of these patients had been diagnosed with Bell's Palsy—a condition that Crossley believes she is an expert[4] in treating—and Crossley's misconduct in accessing that patient's PHI fit exactly into her pattern of violating HIPAA in order

---

[4] In fact, Crossley's prior misconduct in accessing patient PHI to investigate her assignment and scheduling concerns had been motivated, in part, by her belief that more Bell's Palsy patients should be assigned to her.

to investigate her own grievances with Kettering's management regarding the assignment of Bell's Palsy patients.

Isaac asked the other therapist that was assigned to the August 19, 2019 Bell's Palsy patient whether he had sought Crossley's help with that patient or if he had otherwise recently engaged in consultation with Crossley about treating that patient or any other patient. That therapist told Isaac that he had not done either of those things.[5] (Isaac Dep., RE 43, Page ID # 446-47; Slip Sheet-Exhibit EE, RE 49-25, Page ID # 750; Slip Sheet-Exhibit FF, RE 49-26, Page ID # 762). Crossley disputes this and attempts to explain that her unauthorized access of the patient's PHI was because she was actually "training" the other therapist in connection with that patient, and that she accessed the patient's PHI again later that day to follow up on and check the outcome of the initial evaluation with the other therapist. (Crossley Dep., RE 39, Page ID # 331-32). But regardless of whether Crossley was or was not asked to help with the patient, the undisputed fact is that the other therapist told Isaac that Crossley was not asked to help, Crossley's actions exactly matched her recent pattern of misconduct, and Isaac had no reason to doubt the other therapist's statement. Further, even if Crossley did not commit additional HIPAA violations on August 19, 2019, she was still subject to termination as a

---

[5] Specifically, the other therapist, Spencer Ambach, testified that he would have no reason to seek Crossley's help before an initial session with the type of patient at issue. (Ambach Dep., RE 57, Page ID # 1088).

result of her prior conduct. (Douglas Dep., RE 41, Page ID # 383; Isaac Dep., RE 43, 444; Slip Sheet-Exhibit BB, RE 49-22, Page ID # 731-32; Isaac Decl., RE 58, Page ID # 1130).

Isaac, Douglas, Sheldon, Barkley, and Michelle Alexander (Isaac's supervisor), all participated in the process of determining the appropriate level of discipline for Crossley's repeated and egregious violations of Kettering's HIPAA policies and her associated insubordination. (Isaac Dep., RE 43, Page ID # 448-50, 452-53; Slip Sheet-Exhibit HH, RE 49-28, Page ID # 778-79). Sheldon—who is one of the principal authors of Kettering's HIPAA policies and also serves as a principal advisor to other Kettering leaders on the appropriate level of discipline for HIPAA violations of this magnitude—advised the group that immediate termination of Crossley's employment was *required*. (Sheldon Decl., RE 58, Page ID # 1136-37). According to Sheldon, HIPAA violations of this magnitude always result in immediate termination and she would have escalated the matter to the Vice President level for resolution if management had somehow not decided to immediately terminated Crossley's employment. (Sheldon Decl., RE 58, Page ID # 1137). Douglas, Kettering's Human Resources Leader Partner, confirmed that Kettering's Conduct and Discipline Policy did not require progressive discipline in this case and concurred with Sheldon's recommendation. (Douglas Dep., RE 41, Page ID # 377-81, 384; Slip Sheet-Exhibit 11, RE 50-10, Page ID # 949-50). Isaac,

Alexander, and Barkley also concurred, and the unanimous decision was made to terminate Crossley's employment for her repeated violations of Kettering's policies—including HIPAA policies—and for her insubordination in knowingly refusing to follow management's directives. (Isaac Dep., RE 43, Page ID # 447-48, 450, 454-55; Slip Sheet-Exhibit GG, RE 49-27, Page ID # 763-77; Sheldon Dep., RE 55, Page ID # 1057-61; Isaac Decl., RE 58, Page ID # 1130).

Crossley's employment was terminated for repeatedly accessing patient PHI, in violation of Kettering policy and federal law, and for insubordination in persisting in that course of conduct after being warned to stop. (Isaac Decl., RE 58, Page ID # 1130). Indeed, her employment would have been terminated for the HIPAA and privacy violations alone, even if she had not been insubordinate, and there is no evidence that any employee of Kettering has committed equivalent privacy policy violations (or anything even close) and not been terminated immediately. (Isaac Decl., RE 58, Page ID # 1130; Sheldon Decl., RE 58, Page ID # 1137).

None of the actions or decisions made by Kettering or Isaac in connection with Crossley's termination were motivated, in whole or in part, by any reason other than her repeated policy violations and insubordination; nor is there any evidence that anyone at Kettering took any action or made any decision, in whole or in part, for any reason other than her repeated policy violations and

insubordination. There is no evidence that any of the actions or decisions regarding the termination of Crossley's employment were motivated, in whole or in part, by her age, her disability, anyone's perception of her ability or disability, her history of having a disability, her requests for accommodations and leaves of absence, or her history of receiving reasonable accommodations and leaves of absence. (Isaac Decl., RE 58, Page ID # 1130; Sheldon Decl., RE 58, Page ID # 1137).

**D.      Crossley's Requests for, and Receipt of, Reasonable Accommodations and Exemptions**

In the years leading up to her termination, Crossley requested and received several reasonable accommodations for her disabilities. Crossley does not complain about all of these accommodations—*i.e.*, she makes no claim about the lengthy leaves of absence[6] she was granted—but she does appear to allege that some accommodation requests were not granted and also appears to allege that some of Kettering's or Isaac's actions in connection with those accommodations were discriminatory. Crossley's claims are wholly without merit, nevertheless the facts of each accommodation are summarized below.

**1.      Parking in Preferred Parking Spot**

---

[6] For example, Crossley took a leave of absence from approximately November 2018 to March 2019, including a week's extension at the end of her leave to permit her to take a cruise, and encountered no resistance from anyone at Kettering for doing so. (Crossley Dep., RE 39, Page ID # 301, 303-04).

In spring 2017, Isaac questioned whether Crossley should be parking in a so-called "handicap" spot near the entrance door to the clinic. Isaac would have preferred that those spots be left open for patients to use[7] and she told Crossley that she would consult with Kettering's Human Resources if Crossley continued to park there. (Crossley Dep., RE 39, Page ID # 297). Crossley continued to park there without any further incident and Kettering simply added more handicapped parking spaces. (Crossley Dep., RE 39, Page ID # 300-01).

At no point was Crossley ever disciplined, threatened with discipline, or otherwise penalized in any way for parking in any particular parking spot. Isaac conferred with both Crossley and Kettering's Human Resources department regarding the propriety of Crossley parking in certain spots, and then determined that Crossley would be granted the reasonable accommodation of parking in the spot of her choice. None of the actions or decisions of either Kettering or Isaac in connection with Isaac's efforts to understand the situation more fully were motivated, in whole or in part, by Crossley's age, by a disregard for her disability, by her history of having a disability, by her requests for accommodations and leaves of absence, or by her history of receiving reasonable accommodations and leaves of absence. (Isaac Decl., RE 58, Page ID # 1133).

---

[7] Crossley agreed that it was important to keep those spots available for patients to use. (Crossley Dep., RE 39, Page ID # 298).

## 2. Exemption from Vaccine Requirement

In spring of 2019—upon her return from a medical leave of absence—Crossley was identified as one of several employees who needed to have their measles vaccine renewed. (Crossley Dep., RE 39, Page ID # 310, 320-21). Crossley requested an exemption from that vaccination requirement because her disability made it medically inadvisable to receive the vaccine. After verifying the need for the exemption with the appropriate physician, Kettering granted Crossley her requested accommodation and exempted her from that vaccine requirement. (Crossley Dep., RE 39, Page ID # 322).

At no point was Crossley disciplined, threatened with discipline, or otherwise penalized in any way for requesting or obtaining an exemption from Kettering's measles vaccination requirement. None of the actions or decisions of either Kettering or Isaac in connection with Kettering's vaccination policies were motivated, in whole or in part, by any reason other than the obligation imposed upon management by Kettering to ensure compliance with those vaccination requirements. There is no evidence that anyone at Kettering took any action or made any decision, in whole or in part, regarding Crossley's compliance with the vaccination policy that was not in accordance with Kettering's policy and practice. There is similarly no evidence that any of Kettering or Isaac's actions or decisions in connection with Crossley's exemption from the vaccination requirement were

motivated, in whole or in part, by Crossley's age, by a disregard for her disability, by her history of having a disability, by her requests for accommodations and leaves of absences, or by her history of receiving reasonable accommodations and leaves of absence. (Isaac Decl., RE 58, Page ID # 1133-34).

### 3. Exemption from the CPR Certification Requirement

In spring of 2019, towards the end of Crossley's medical leave of absence, Crossley was notified that her CPR certification would expire soon and would have to be renewed. (Crossley Dep., RE 39, Page ID # 304). Crossley attempted to renew her certification at a Kettering facility, but was unable to complete the physical performance component of the recertification for unknown reasons.[8] (Douglas Dep., RE 41, Page ID # 375-77; Slip Sheet-Exhibit 9, RE 50-8, Page ID # 944; Slip Sheet-Exhibit S, RE 50-11, Page ID # 951-52). Crossley reported her inability to complete the test to a coworker, who was not a member of management, and was told that she would need to request an exemption if she could not complete the test. (Crossley Dep., RE 39, Page ID # 305, 319). Upon hearing this, Crossley immediately set out to do so and received the exemption. (Crossley Dep., RE 39, Page ID # 306-09).

---

[8] Crossley's explanations for why she could not complete the test vary: at times she appears to suggest that her disability interfered with her performance, and at other times she appears to suggest that the test dummy (upon which she was trying to perform adequate chest compressions) was broken. (Crossley Dep., RE 39, Page ID # 305-09).

Crossley's physician unequivocally stated that she was unable to perform CPR chest compressions and did not caveat that statement by saying that she could do so with an accommodation. (Isaac Dep., RE 43, Page ID # 431; Slip Sheet-Exhibit U, RE 49-15, Page ID # 722). Nevertheless, Crossley was aware that she could attempt to take the test on other test dummies at Kettering,[9] that she could have attempted to recertify at various locations outside of Kettering, or even that she could have made some attempt to review Kettering's CPR certification polices.[10] Crossley did none of those things and instead chose to obtain an exemption with no further efforts to become CPR certified. (Crossley Dep., RE 39, Page ID # 305-09; Isaac Dep., RE 43, Page ID # 429; Slip Sheet-Exhibit Q, RE 49-11, Page ID # 711-12).

**E.    Other Necessary and Nondiscriminatory Management Decisions**

Crossley also complains about other management decisions and appears to allege that Kettering and Isaac's actions in connection with those decisions were discriminatory. The is zero merit to those allegations or claims, the facts of which are summarized below.

**1.    Assignment of Patients to Therapists**

---

[9] Crossley admitted that Isaac informed her that the test could be performed at other Kettering locations if Crossley wished to try again with a different test dummy. (Crossley Dep., RE 39, Page ID # 305).

[10] Crossley admitted that she knew where to find Kettering's CPR certification policies, but chose not to review them. (Crossley Dep., RE 39, Page ID # 318-19).

Crossley became dissatisfied with some of Kettering's decisions regarding the assignment of certain patients to certain therapists. Crossley admits, however, that she does not know what criteria Kettering uses to make those assignment decisions, and she cannot say from personal knowledge that certain patients were inappropriately assigned to other therapists and why. (Crossley Dep., RE 39, Page ID # 296, 324, 328).

At all times, the assignment of patients to Crossley for treatment was determined by the legitimate business needs of Kettering's NeuroRehab Center. Those reasons included, but were not limited to, the patient's diagnosis, the particular care needed by the patient, the patient's preferred schedule of days and times for receiving care, the availability of the therapist or therapists best suited to meet the patient's care needs and the patient's preferred schedule, and other non-discriminatory and legitimate departmental reasons. (Crossley Dep., RE 39, Page ID # 324; Douglas Dep., RE 41, Page ID # 379; Isaac Dep., RE 43, Page ID # 433, 437-38; Isaac Decl., RE 58, Page ID # 1130-31). There is no evidence that the criteria for assigning patients to particular therapists for care was not applied equally to all employees. None of the actions or decisions regarding the assignment of patients to Crossley for treatment were motivated, in whole or in part, by Crossley's age, her disability, anyone's perception of her ability or disability, her history of having a disability, her requests for accommodation and leaves of

absence, or her history of receiving reasonable accommodations and leaves of absences. (Isaac Decl., RE 58, Page ID # 1130-31).

## 2. Work Schedules and Crossley's Voluntary move to Part-Time Status

At all times, the assignment of Crossley's scheduled work hours was made in accordance with the legitimate business needs of Kettering's NeuroRehab Center, the limits that Crossley voluntarily imposed on when she would make herself available to work, and Crossley's own agreement. (Isaac Dep., RE 43, Page ID # 432; Slip Sheet-Exhibit V, RE 49-16, Page ID # 723; Isaac Decl., RE 58, Page ID # 1131). The legitimate departmental business reasons for determining the scheduled work hours of all therapists, including Crossley, included the requirement of having a CPR-certified therapist on site at all times when a patient was there, and the need to avoid having therapists there with no patients to treat. (Isaac Decl., RE 58, Page ID # 1131).

After Crossley received the reasonable accommodation of an exemption from Kettering's CPR certification requirement—an accommodation that she specifically requested in lieu of pursuing other options to recertify—she could not be scheduled to work at a time when another CPR-certified therapist would not also be there. (Crossley Dep., RE 39, Page ID # 314-15; Isaac Decl., RE 58, Page ID # 1131-32). As a result, Crossley could only be scheduled to work at times

when other therapists would also be there treating patients. (Isaac Decl., RE 58, Page ID # 1131-32).

Crossley claims that Kettering should have paid other therapists to sit idly by while she treated patients, solely for the purpose of having a CPR-certified therapist on site at all times. For budgetary reasons, that was an impossibility. Indeed, the NeuroRehab Center routinely modified all of its therapists' work schedules—by requiring them to go home and use paid time off ("PTO")—if there were no patients for a therapist to treat at that particular time. (Crossley Dep., RE 39, Page ID # 311-12; Isaac Dep., RE 43, Page ID # 437; Isaac Decl., RE 58, Page ID # 1131-32). It would therefore not be economically feasible to require a CPR-certified therapist to sit around, without a patient to treat, simply because Crossley was there treating a patient. Or, to put it another way, the cost of scheduling a CPR-certified chaperone for Crossley would have been unduly burdensome and would have imposed an economic hardship on Kettering. (Crossley Dep., RE 39, Page ID # 314; Isaac Decl., RE 58, Page ID # 1131-32).

Crossley also claims that Kettering should have imposed an undue burden on *disabled* patients to ensure the availability of full-time hours for her. Some of the patients treated by therapists in the NeuroRehab Center were under the care of multiple therapists because they needed more than one kind of therapy. Kettering, acting through Isaac and other members of management, attempted whenever

possible to assign therapists to and schedule those patients' therapy appointments in such a way as to enable them to receive all of their therapy on the same day of the week. Most of these patients were in poor health, and requiring them to make multiple trips to the hospital for therapy each week imposed an unnecessary burden on them. Kettering, acting through its management including Isaac, refused to put Crossley's *preferences* over the *needs* of patients and instead uniformly scheduled patient appointments in accordance with what was best for the patient rather than the whims of an individual therapist. (Isaac Decl., RE 58, Page ID # 1132).

Finally, Isaac offered to schedule Crossley for hours on Wednesdays, which would have easily enabled her to maintain a full-time work schedule. (Isaac Decl., RE 58, Page ID # 1132). Crossley, however, refused to work on Wednesdays[11] throughout her employment with Kettering and therefore turned down Isaac's offer to work some hours on Wednesdays to maintain a full-time work schedule. After being informed that *her decision* to not work on Wednesdays would lower her scheduled work hours to a part-time status, Crossley agreed, in writing, to accept a part-time work schedule in conjunction with the CPR certification exemption she also chose to request. (Crossley Dep., RE 39, Page ID # 313, 315-16).

---

[11] Crossley testified that she could have worked on Wednesdays, but doing so would have required her to change a routine that she liked so she chose not to do so. (Crossley Dep., RE 39, Page ID # 313-14).

In short, the criteria for assigning scheduled work hours to therapists in the NeuroRehab Center was applied equally to all employees.[12] (Isaac Decl., RE 58, Page ID # 1133). None of the actions or decisions regarding the assignment of scheduled work hours to Crossley were motivated, in whole or in part, by Crossley's age, her disability, anyone's perception of her ability or disability, her history of having a disability, her requests for accommodations and leaves of absence, or her history of receiving reasonable accommodations and leaves of absence. (Isaac Decl., RE 58, Page ID # 1133).

## F.   **Procedural History**

Crossley filed suit against Kettering and Isaac on July 22, 2020, wherein she asserted claims for: (1) Disability Discrimination in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*); (2) Disability Discrimination in violation of the Ohio Civil Rights Act (O.R.C. § 4112.02); (3) Failure to Provide a Reasonable Accommodation in violation of the Americans with Disabilities Act (42 U.S.C. § 12010 *et seq.*); (4) Age Discrimination in violation of the Age Discrimination in Employment Act (29 U.S.C. § 623); and (5) Age Discrimination in violation of the Ohio Civil Rights Act (O.R.C. § 4112.02). (Complaint, RE 1, Page ID # 1-13). Crossley later amended her Complaint to reflect that her state law

---

[12] Crossley admitted that she has no actual knowledge of the work schedules of other therapists at NeuroRehab. (Crossley Dep., RE 39, Page ID # 315, 317-18).

claims were being brought under O.R.C. § 4112.99 (Disability Discrimination) and O.R.C. §§ 4112.14 and 4112.99 (Age Discrimination) but otherwise did not change her causes of action against Kettering and Isaac. (Amended Complaint, RE 7, Page ID # 25-37).

Kettering and Isaac answered Crossley's Amended Complaint, denied the allegations contained therein, and subsequently, on July 22, 2022, moved for summary judgment on all counts. (Answer, RE 8, Page ID # 41-50; Motion for Summary Judgment, RE 58, Page ID # 1091-1127). The motion was fully briefed and, on March 20, 2023, the district court entered an order granting Defendants' request for summary judgment. (Order, RE 66, Page ID # 1219-38). This appeal followed. (Notice of Appeal, RE 68, Page ID # 1240).

## SUMMARY OF THE ARGUMENT

Crossley alleges that Defendants' decision to terminate her employment constituted age and disability discrimination in violation of both federal and state law. But Crossley cannot point to any evidence—let alone evidence sufficient to create a genuine issue of material fact—to support those claims. Instead, the record clearly demonstrates that Crossley was terminated because she knowingly, intentionally, and repeatedly committed egregious violations of Kettering's privacy policies and HIPAA even after she was expressly told to stop. That is unequivocally a fireable offense and therefore Defendants were justified in terminating Crossley's employment and it cannot be said that their decision to terminate was a pretext for anything, including unlawful discrimination.

Accordingly, because there are no genuine issues of material fact and because Defendants are entitled to judgment as a matter of law, this Court should affirm the district court's grant of summary judgment in Defendants' favor.

# ARGUMENT

## A. Standard of Review

A district court's grant of summary judgment is reviewed de novo. *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008)). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "No genuine dispute of material fact exists '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Levine*, 64 F.4th at 786 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

> [T]he moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389-90 (6th Cir. 2008) (internal citations omitted).

After the parties present evidence, the Court's "function is not . . . to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making that determination, the Court "must draw all inferences in the light most favorable to the non-moving party." *White*, 533 F.3d at 390 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "However, 'the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgement]; there must be evidence on which the jury could reasonably find for" the non-moving party. *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252).

## B.     The District Court Correctly Awarded Defendants Summary Judgment on All Claims

Defendants are entitled to summary judgment on all claims. As the district court correctly found, Defendants "had a legitimate, non-discriminatory reason for firing Crossley—violating Kettering's . . . HIPAA policies—and Crossley's pretext arguments do not create a triable issue. Moreover, Defendants reasonably accommodated [Crossley's] disabilities." (Order, RE 66, Page ID # 1228). Accordingly, as explained more fully below, because there are no genuine issues of material fact, and because Defendants are entitled to judgment as a matter of law, the district court's decision to grant the motion for summary judgment must be

affirmed by this Court. *See Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)) (An appellate court "will affirm a grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law'").

### 1. Applicable Legal Standards

#### a. Disability Discrimination

To succeed on a claim for disability discrimination under both the Americans with Disabilities Act ("ADA") and Ohio law,[13] a plaintiff must prove that she: (1) has a disability; (2) is qualified to perform the job requirements with or without reasonable accommodation; and (3) would not have been discharged, or suffered another adverse employment action sufficient to form a legally cognizable injury, but for the disability. *Darby v. Childvine, Inc.*, 956 F.3d 440, 444 (6th Cir. 2020). To prove a claim for disability discrimination, a plaintiff may use one of two methods: direct evidence or indirect evidence. *Babb v. Maryville*

---

[13] "[A]nalysis of claims made pursuant to the Americans with Disabilities Act applies to claims made pursuant to [O.R.C.] § 4112.02." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *see also Spitulski v. Bd. of Educ. of the Toledo City Sch. Dist.*, 121 N.E.3d 41, 54, 2018-Ohio-3984 (6th Dist.) (detailing the same general burden shifting analysis employed by the federal courts).

*Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). Direct evidence does not require the factfinder to make any inferences to conclude that the challenged employment action was motivated by prejudice, and generally takes the form of the employer telling the employee. "I fired you because you are disabled." *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998). Cases that are based on such direct evidence are, obviously, rare.

The much more common method of proving disability discrimination is through indirect evidence, which is evaluated under the *McDonnell Douglas* burden-shifting approach. Under this approach: (1) the plaintiff must first establish a *prima facie* case of employment discrimination; (2) the employer must then articulate a legitimate, non-discriminatory reason for termination or other adverse action; and (3) the plaintiff must then show by a preponderance of the evidence that the employer's proffered reasons are pretextual. *See Babb*, 942 F.3d at 319-20.

To establish a *prima facie* case of disability discrimination using indirect evidence, a plaintiff must demonstrate that he or she is: (1) disabled; (2) otherwise qualified for the position with or without accommodation; (3) suffered an adverse employment action; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) if the adverse action was termination, the plaintiff was replaced or the job remained open. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016), *abrogated on other grounds by Babb*, 942 F.3d at 319. An adverse

employment action is a """"materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct."""" *Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). The adverse employment action must constitute "a significant change in employment status, such as firing, hiring, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Plautz*, 156 F. App'x at 817.

After a plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for terminating the plaintiff. *Ferrari*, 826 F.3d at 892. The burden on the employer is "one of production, not persuasion," and is not meant to be onerous. *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). If the employer is able to carry that burden and provide a non-discriminatory reason for the plaintiff's termination, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Babb*, 942 F.3d at 320. A plaintiff can do so by pointing to evidence that the employer's stated reasons: (1) have no basis in fact; (2) did not actually motivate the employer's action; or (3) were insufficient to motivate the employer's action. *Id.* The plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the

extent such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.*

>   b.   Age Discrimination

The Age Discrimination in Employment Act ("ADEA") and Ohio law[14] both prohibit employers from terminating employees because of their age. *See* 29 U.S.C. § 623(a)(1); O.R.C. § 4112.14(A). To satisfy the "because of" requirement, a plaintiff must "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employment decision." *Gross v. FPL Fin. Servs., Inc.*, 557 U.S. 167, 177-78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2008). Direct evidence is evidence that proves the existence of a fact without inferences (*i.e.*, "smoking gun" evidence that explains itself). *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). If the employee cannot show age discrimination with direct evidence, then she must do so with circumstantial (*i.e.*, indirect) evidence which the Court evaluates using the same *McDonnell Douglas* three-step burden shifting analysis outlined above, under which: (1) the plaintiff must establish a *prima facie* case of discrimination; (2) if the plaintiff is successful, then the employer must identify a legitimate, non-discriminatory reason for termination; and (3) if the employer is able to do so, then

---

[14] Age discrimination claims brought under O.R.C. § 4112.14 are "analyzed under the same standards as federal claims brought under the [ADEA]." *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009).

the burden shifts back to the plaintiff to show that the employer's identified reason is a mere pretext. *Id.* at 324-25.

To make a *prima facie* case for age discrimination, a plaintiff must show that she: (1) was a member of a protected class (*i.e.*, older than 40 years of age); (2) suffered an adverse employment action; (3) was qualified for the position held; and (4) was: (a) replaced by someone outside of the protected class (*i.e.*, younger than 40 years of age), or (b) similarly situated non-protected employees were treated more favorably. *Id.* at 326. An adverse employment action is a ""materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct."" *Plautz*, 156 F. App'x at 817 (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). The adverse employment action must constitute "a significant change in employment status, such as firing, hiring, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus.*, 524 U.S. at 761; *see also Plautz*, 156 F. App'x at 817.

If the plaintiff is able to make a *prima facie* case of age discrimination, then the burden shifts to the employer to provide a non-discriminatory reason for the plaintiff's termination. *Pelcha*, 988 F.3d at 324-25. If the employer can do so, then the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason is simply a pretext for age discrimination. *Mile v. South Central Human*

*Resources Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). "This 'is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* at 888 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "Plaintiffs typically show pretext in one of three ways: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

### c. The Honest Belief Rule

The Sixth Circuit's modified version of the Seventh Circuit's "honest belief" rule applies to all of Crossley's discrimination claims. *See Blizzard v. Marion Tech. College*, 698 F.3d 275, 286 (6th Cir. 2012) (applying the honest belief rule to ADEA claims); *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (applying the honest belief rule to ADA claims). Under the Sixth Circuit's characterization, the honest belief rule states:

> "Pretext may be shown 'either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Under the "honest belief" rule developed by the Seventh Circuit, "so long as the employer honestly believed in the proffered reason," an employee cannot prove pretext even if the employer's reason in the end is shown to be "mistaken, foolish, trivial, or baseless." [The Sixth Circuit has] rejected the Seventh Circuit's bare "honest belief" doctrine and instead ha[s] adopted a modified honest-belief approach. Under this approach, for an employer to avoid a

finding that its claimed nondiscriminatory reason was pretextual, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." Even when the employer makes such a showing, "the protection afforded by the rule is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'"

In determining whether an employer "reasonably relied on the particularized facts then before it, [the Sixth Circuit does] not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."

*Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707-08 (6th Cir.) (internal citations omitted); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-14 (6th Cir. 2007). Indeed, "it is well settled that a court 'may not reject an employer's explanation [of its action] unless there is a sufficient basis in the evidence for doing so.'" *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 20 (6th Cir. 2007) (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 600 (6th Cir. 2001)).

   d. Reasonable Accommodations

  The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). And an employer's "failure to provide a reasonable accommodation can constitute the type of unlawful discrimination barred by the statute." *Cash v. Siegel-Robert, Inc.*, 548 F. App'x

330, 334 (6th Cir. 2013) (citing *Keith v. Cnty. Of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)).

"An ADA claim based on an employer's failure to provide a reasonable accommodation unavoidably 'involve[s] direct evidence (the failure to accommodate) of discrimination' because the employer necessarily relied on the employee's disability in making decisions." *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868-69 (6th Cir. 2007)). Accordingly, to prove a claim of failure to provide a reasonable accommodation, a plaintiff must show that: "(1) he is disabled within the meaning of the ADA and that (2) he is 'otherwise qualified' for the position he holds or desires despite his disability: '(a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Id.* (quoting *Hedrick v. W. Resrv. Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)).

However, the ADA is not a "catchall" statute. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). It "does not endow all disabled persons with a . . . job schedule . . . of their choosing." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015) (en banc). And, "[i]mportantly, an employee cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation." *Talley v. Fam. Dollar Stores of Ohio, Inc.* 542 F.3d 1099, 1108 (6th Cir. 2008). "'[T]he employer providing the accommodation has

the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier to provide.'" *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996) (quoting 29 C.F.R. pt. 1630, app. at 415); *see also Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 25 (6th Cir. 2004) ("Where there is more than one reasonable accommodation, the choice of accommodation is the employer's.").

### 2.  Crossley's Termination was Lawful

As explained at length above, Crossley was terminated for the legitimate, non-discriminatory reason that she knowingly and intentionally violated multiple policies applicable to her employment. Kettering and Isaac have thoroughly explained why she was terminated and therefore have shifted the burden back to Crossley to respond. *See Pelcha*, 988 F.3d at 324-25; *Babb*, 942 F.3d at 319-20. To avoid summary judgment, Crossley must demonstrate that the reasons proffered by Kettering and Isaac are pretextual. *See Pelcha*, 988 F.3d at 324-25; *Babb*, 942 F.3d at 319-20. She could not do so before the trial court, and she has again failed to do so before this Court on appeal.

a.    Crossley failed to establish that the stated reasons for terminating her employment (*i.e.*, her repeated and egregious violations of Kettering's policies and HIPAA) were a mere pretext.

Crossley first argues[15] that her claim that she received text messages, allegedly from Kettering, almost two years after her termination inviting her to apply to be a speech pathologist creates a question of fact regarding whether Kettering actually believed her conduct warranted termination. (Appellant's Brief, p. 19). She then later argues that she carried her burden for establishing pretext by pointing to allegedly conflicting reasons for her termination provided by Kettering and Isaac as well as discriminatory comments that Isaac purportedly made about Crossley's age *multiple years* before she was terminated. (Appellant's Brief, pp. 25-30). None of these arguments have merit.

All of Crossley's proffered bases for pretext fall well short of being enough for a reasonable jury to find in her favor. *See White*, 533 F.3d at 390 (quoting

---

[15] Crossley couches this argument within a broader argument that the district court misstated the standard for pretext. (Appellant Brief, pp. 17-19). But as noted above, this Court reviews the district court's decision to grant summary judgment *de novo*. *Levine*, 64 F.4th at 796. Under *de novo* review, this Court determines the law independent of the trial court and therefore whether the district court correctly applied the standard for pretext or not—it did—is irrelevant to this Court's analysis. *See Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1014 (6th Cir. 2003) (Refusing to consider the purported legal conclusions or reasoning of the district court judge because the appellate court "give[s] no deference to such material on de novo review."); *see also Ornelas v. United States*, 517 U.S. 690, 705, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (Scalia, J., dissenting) ("[I]n *de novo* review, the 'weight due' to a trial court's finding is zero.").

*Liberty Lobby*, 477 U.S. at 252) ("However, 'the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgement]; there must be evidence on which the jury could reasonably find for" the non-moving party.). Indeed, two of her proffered bases occurred either two-years before (Isaac's alleged discriminatory comments) or two years after (the alleged text messages from a Kettering recruiter) her termination and are therefore far too attenuated from the termination of her employment to have played any role in that decision. And the remaining basis, that Kettering and Isaac offered conflicting reasons for Crossley's termination, finds no support in the record.

Crossley argues that Isaac and other representatives from Kettering offered shifting explanations for her termination, but there is nothing in the record to support that contention. Instead, both Isaac and Kettering as a whole have been clear from the beginning that Crossley was terminated for repeatedly accessing patient PHI in violation of HIPAA after she was expressly warned to stop. Whether every member of Kettering's management team referred to the underlying policies with precision or by their exact name is irrelevant. There has never been a question in this case as to why Crossley was terminated, and Defendants explanation for the same has been consistent throughout. Nevertheless, Crossley cites to one, unpublished case—*Gaglioti v. Levin Grp., Inc.*, 508 F. App'x 476 (6th Cir.

2012)—in which this Court has held that contradictory testimony can serve as a basis for pretext. (Appellant's Brief, pp. 26-27). But *Gaglioti* is clearly distinguishable from this case because it dealt with contradictory testimony regarding the specific *reason* that an employee was terminated, not minor variations regarding the name or provision of a policy. *See id.* at 482-83 (finding pretext where one "key player" testified that an employee's unsatisfactory performance was the reason for his termination and another testified that the employee's work performance had nothing to do with the termination decision).

Simply put, there is no genuine issue of material fact as to why Crossley was terminated and her attempts to create one where none exists are unavailing.

> b.     Regardless of whether the Sixth Circuit's honest belief rule applies, Crossley loses.

Finally, Crossley argues that the Sixth Circuit's honest belief rule does not apply because she is not challenging the factual basis of her termination but rather whether Kettering and Isaac conducted a pretextual investigation to bolster their decision to terminate Crossley, thereby putting their actual motivation at issue. (Appellant's Brief, pp. 23-25). Not only does this argument paint Crossley's position with way too fine of a brush, but it also stands in stark contrast to the rest of her case in which she does nothing but allege that the factual basis for her termination is flawed because she did not violate Kettering's policies. (*See* Amended Complaint, RE 7, Page ID # 30). Admission of the facts supporting the

proffered reasons for termination is a necessary component of proving that the motivation underlying those reasons was pretextual, and therefore Crossley's reframed argument in favor of pretext must fail for that reason alone. *See Blizzard*, 698 F.3d at 287 n.6 (Using a defendant's underlying motivation to prove pretext "'requires that the plaintiff "admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal."'" It is therefore "problematic" for a plaintiff to use a defendant's underlying motivation to prove pretext when that plaintiff is actively disputing the factual basis for the proffered reasons.).

Further, even if Crossley could put the nature of the investigation at issue to argue that Defendants' termination decision was prompted by improper motives, there is nothing in the record to support Crossley's position. Indeed, as demonstrated above, Kettering and Isaac went above and beyond in their investigation of Crossley—giving her every benefit of the doubt and every opportunity to correct her behavior and conform to Kettering's policies—and only terminated her when Crossley's conduct left them with no other viable alternative. There is therefore no genuine issue of material fact regarding the quality of the investigation or the lengths to which Defendants went because: (1) the uncontested evidence establishes that a thorough investigation was performed; and (2) Crossley fails to dispute *any* of the central factual findings of the investigation.

### 3. Crossley's Remaining Claims are Waived

Crossley makes no argument regarding her claims that Kettering failed to provide her with reasonable accommodations in violation of the Americans with Disabilities Act and therefore any appeal regarding those claims is waived. *See Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021) ("Generally, an 'appellant abandons all issues not raised and argued in its initial brief on appeal.'"). Further, even if Crossley did properly raise and brief the issue, her claims are wholly without merit as Kettering's resolution of Crossley's multiple accommodation requests and its scheduling of patients with Crossley was entirely lawful.

## CONCLUSION

For all of the foregoing reasons, Defendant-Appellants Kettering Adventist Healthcare d/b/a Kettering Health Network (n/k/a Kettering Health) and Belinda Isaac respectfully submit that the District Court's grant of summary judgment in their favor should be affirmed.

July 19, 2023

s/ Timothy G. Pepper
Timothy G. Pepper (0071076)
Christopher M. Wolcott (0099696)
TAFT STETTINIUS & HOLLISTER LLP
40 N. Main Street, Suite 1700
Dayton, Ohio  45423
Tel:  937.228.2838
Fax:  937.228.2816

pepper@taftlaw.com
cwolcott@taftlaw.com

*Attorneys for Defendant-Appellees
Kettering Adventist Healthcare d/b/a
Kettering Health Network and Belinda
Isaac*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word-processing system used to prepare the brief, Microsoft Word, indicates that this brief contains 10,727 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. I.O.P. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

July 20, 2023

s/ Timothy G. Pepper
Timothy G. Pepper (0071076)
Christopher M. Wolcott (0099696)
TAFT STETTINIUS & HOLLISTER LLP
40 N. Main Street, Suite 1700
Dayton, Ohio 45423
Tel: 937.228.2838
Fax: 937.228.2816
pepper@taftlaw.com
cwolcott@taftlaw.com

*Attorneys for Defendant-Appellees*
*Kettering Adventist Healthcare d/b/a*
*Kettering Health Network (n/k/a Kettering*
*Health) and Belinda Isaac*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Brief of

Defendant-Appellee Kettering Adventist Healthcare d/b/a Kettering Health

Network was filed this 20th day of July, 2023, via the CM/ECF system, which will

serve all counsel of record.

s/ Timothy G. Pepper               
Timothy G. Pepper (0071076)

**ADDENDUM**

| Record Entry No. | Description of Document | Date Filed | Page ID Range |
|---|---|---|---|
| 7 | Amended Complaint | 09/21/2020 | 25-40 |
| 8 | Answer | 10/06/2020 | 41-50 |
| 49-11 | Slip Sheet-Exhibit Q | 06/09/2022 | 711-12 |
| 49-15 | Slip Sheet-Exhibit U | 06/09/2022 | 722 |
| 49-16 | Slip Sheet-Exhibit V | 06/09/2022 | 723 |
| 49-22 | Slip Sheet-Exhibit BB | 06/09/2022 | 731-41 |
| 49-23 | Slip Sheet-Exhibit CC | 06/09/2022 | 472-48 |
| 49-26 | Slip Sheet-Exhibit FF | 06/09/2022 | 762 |
| 49-28 | Slip Sheet-Exhibit HH | 06/09/2022 | 778-79 |
| 50-8 | Slip Sheet-Exhibit 9 | 06/09/2022 | 944 |
| 50-10 | Slip Sheet-Exhibit 11 | 06/09/2022 | 949-50 |
| 50-11 | Slip Sheet-Exhibit S | 06/09/2022 | 951-52 |
| 50-14 | Slip Sheet-Exhibit EE | 06/09/2022 | 955-1013 |
| 57 | Deposition of Spencer Ambach | 07/21/2022 | 1079-90 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |